At the hearing on 21 July 1995, plaintiff offered into evidence a five page typewritten statement signed by plaintiff and a Vitallium Alloy Processing Technique Manual. Defendants objected to the admission of the exhibits. Briefs were solicited from the parties on the admissibility of the proffered exhibits. By Order entered 25 September 1995, plaintiff's written statement was excluded from evidence but the Vitallium Alloy Processing Technique was admitted.
The Full Commission has reviewed the prior Opinion and Award based on the record of the proceedings before Deputy Commissioner Mary Moore Hoag and the briefs and oral arguments on appeal. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or to amend the prior Opinion and Award, except for the additions relating to the award of fees pursuant to G.S. § 97-88.
****************
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 21 July 1995 and in a Pre-Trial Agreement, signed by the parties, as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. State Farm Fire Casualty is the carrier on the risk.
4. From 1985 through December 1993, plaintiff was employed by defendant-employer.
5. The average weekly wage of plaintiff was $610.41 per week.
6. The parties stipulated to the introduction of the following documents:
 a. Plaintiff's medical records from Dr. Leon Cochran. (5 pp.)
 b. Mecklenburg Medical Group; Dr. Allen R. Thalinger and Dr. James B. Jones (48 pp.)
c. Dr. David E. Shanks (15 pp.)
 d. Transcribed record of 27 October 1993 statement dictated by plaintiff to Sandra Schumann of State Farm Insurance.
 e. Material Dated Safety Sheets for Vitallium Processing system, (Both parties stipulated only to the effect that the documents are genuine and correctly reference those chemicals used at Precision Dental Lab.)
****************
The Full Commission adopts the finding of fact found by the Deputy Commissioner as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was a sixty-seven year old married male, who has retired. He was born on 9 December 1928. Plaintiff completed high school, served in the Armed Forces and immediately thereafter began working as a dental laboratory technician. Plaintiff worked as a dental laboratory technician for forty-three years before retiring in December, 1993. He owned and operated a dental laboratory in Alabama. In 1985, plaintiff joined Precision Dental Lab as the head of its Partial Denture Department. He supervised two other employees. During the first five years of his employment with defendant-employer, he worked at a lab located on Central Avenue in Charlotte. Thereafter, in July 1990 and until his retirement, he worked at a newly constructed lab at Crown Point.
2. Plaintiff worked approximately forty to fifty hours per week in the partials department at defendant-employer's at both locations. He constructed custom removable partial denture prostheses out of metal (Vitallium and Ticonium). Plaintiff's duties consisted of designing and constructing removable denture prostheses out of metal which were then sent to the denture department where acrylic teeth and gums were added. In an average day, plaintiff and his assistants worked on seven to ten prostheses or "castings" from impressions of patients' mouths made by dentists. Plaintiff created models based on wax castings. There were several steps to this process beginning with the negative impression of the patients' teeth obtained by the dentist, to the final prostheses. A positive reproduction is first made in wax. This pattern is placed in a casting ring filled with refractory material. The wax is eliminated by heating, leaving an empty mold chamber. Molten alloy is poured into the mold and set by means of centrifugal force. After the metal cools, it is broken. Then the prostheses are sandblasted and finished using a variety of lathes and hand tools. Plaintiff's task in making the prostheses included mixing powder and liquid chemicals to make the refractory models; casting the metal which becomes the framework for the partial; sandblasting the prostheses; and cutting, grinding and polishing the prostheses in several steps. In addition, plaintiff had some responsibility for customer relations.
3. The products to which plaintiff was exposed as part of his work for Precision Dental Lab included V.R. Binder; Perflex Mold Soak; V.R. Binder Thinner; Vitallium Metal, polishing compounds; electro-polishing solution; rubber points and wheels; mounted and unmounted stones; high-speed, black high speed cutting and sprue cut-off discs; flexseal lacquer; flexseal liquid adhesive; V.R. Investment; Protective Coat Liquid; all purpose protective coat; Austenal Universal Solvent; abrasive mix; and dental sand. During plaintiff's work for defendant-employer, he was specifically exposed to dust containing cobalt, chromium, molybdenum, silica, graphite, aluminum oxide, silicon carbide, titanium dioxide, zinc oxide fume, iron oxide fume, magnesium oxide, ammonia hydroxide, as well as methylene chloride, sulfuric acid, hydrochloric acid, toluene, and other chemicals.
4. Plaintiff's medical history prior to working for defendant-employer was unremarkable for lung disease as evidenced by normal chest x-rays and lack of medical history. A chest x-ray taken on 29 December 1983 showed no sign of lung problems.
5. On 18 June 1991, plaintiff presented to Dr. Allen R. Thalinger for a check up. An x-ray was taken which revealed diffuse interstitial lung disease compatible with pulmonary fibrosis. Pulmonary Fibrosis is one of several forms of interstitial lung disease.
6. In July, 1991, plaintiff was referred to a pulmonary specialist, Dr. James B. Jones for further evaluation. Dr. Jones treated plaintiff from 29 July 1991 through 22 February 1994. Dr. Jones noted a one year history of dyspnea (shortness of breath) with heavy exertion. Plaintiff's pulmonary fibrosis was new since the last x-ray taken in 1983 and his lung disease was active. Lupus was ruled out as the cause of plaintiff's lung scarring. Dr. Jones prescribed prednisone therapy.
7. Plaintiff underwent numerous diagnostic studies while under Dr. Jones' care and treatment. Repeat x-rays were administered to plaintiff. He had pulmonary function tests, a bronchoscopy, a gallium scan to test for interstitial changes in the lungs, and blood tests aimed at analyzing plaintiff's oxygenation levels. A gallium scan of plaintiff's chest was completed in August 1991. It revealed a mild to moderate increase in interstitial markings reflecting an active disease process consistent with fibrosis. Blood gas studies revealed some decrease in diffusing capacity.
8. On 28 August 1991, plaintiff underwent a bronchoscopy, which involved taking cultures from biopsies of middle and lower lobes. Interstitial fibrosis without active inflammation was present. In light of plaintiff's positive gallium scan, shortness of breath and bronchoscopy, Dr. Jones prescribed Prednisone. Plaintiff remained on 40 mg. of Prednisone per day through October, 1991, at which time a taper of the Prednisone dosage was prescribed.
9. Plaintiff presented to Dr. Jones again in September 1993, for an examination. There was a significant reduction in plaintiff's diffusing capacity as well as a mild decrease in lung volumes. Plaintiff was also experiencing some desaturation with exercise. Dr. Jones recommended plaintiff avoid additional potential exposure to the work environment. Dr. Jones favored a thoracic open biopsy which might be of more diagnostic use to give evidence of foreign bodies or inhaled types of toxic reaction than previous bronchoscopic biopsies. Although Dr. Jones was not absolutely positive about the etiology of plaintiff's fibrosis, he eventually diagnosed plaintiff as having pulmonary fibrosis that "could" be related to workplace exposure.
10. Plaintiff declined to undergo the more specific diagnostic studies. Plaintiff's last visit with Dr. Jones occurred on February 22, 1994.
11. Plaintiff's attorney referred him to Dr. David E. Shanks on 15 December 1993. Dr. Shanks is a pulmonologist who has been employed since 1976 in Charlotte. He completed fellowships in pulmonary disease at the University of Oregon Medical School. Dr. Shanks is Board Certified in internal medicine and Board Eligible in pulmonary disease. Dr. Shanks is on the Byssinosis and Asbestosis Panels of the North Carolina Industrial Commission Panels and at one time was Director of Respiratory Therapy at Presbyterian Hospital.
12. Dr. Shanks is familiar with respiratory problems and the causes of respiratory problems as well as occupational diseases that relate to respiratory problems. Dr. Shanks attended an Occupational Lung Disease Conference in June of 1992, held at Wesley Chapel in Florida, which included a segment of discussion of dental technician's pneumoconiosis. Dr. Shanks has had a continuing association with the doctor who led the discussion of dental technician's pneumoconiosis at the conference. Dr. Shanks was in contact with Dr. Chandler subsequent to his examination of plaintiff and requested articles from Dr. Chandler on the subject of dental technician's pneumoconiosis.
13. The data, reports and literature on dental technician's pneumoconiosis are very limited at this time. The articles on dental technician's pneumoconiosis, which were relied upon by Dr. Shanks in his diagnosis of plaintiff, were introduced into evidence as Plaintiff's Exhibits 1-7}.
14. Dr. Shanks diagnosed plaintiff as having dental technician's pneumoconiosis and pulmonary fibrosis, secondary to dental technician's pneumoconiosis. Pulmonary Fibrosis describes the pathological process in plaintiff's lungs. "Dental technician's pneumoconiosis" describes the cause of the pulmonary fibrosis: the inhalation of airborne dust particles found in dental laboratories.
15. Central to Dr. Shanks' diagnosis of plaintiff's problems as dental technician's pneumoconiosis and restrictive lung disease, secondary to dental technician's pneumoconiosis, were the following facts: plaintiff had quit smoking forty years previously and at that time had only smoked four to five years with a quantity of one half pack per day; plaintiff also had a history of hospitalization for asthmatic bronchitis.
16. Plaintiff presented to Dr. Shanks again on 8 March 1995, when lab tests were performed. Spirometry before and after bronchodilators, lung volume studies, diffusion capacity and arterial blood gases and oxygen saturation tests were administered. Tests that were abnormal and significant included plaintiff's CO diffusion and arterial blood gases done at rest and with exercise. Plaintiff's arterial blood gases with exercises and his PO2 or partial pressure of oxygen decreased from 86 to 76. With exercise, plaintiff decreased his oxygen levels. With decreased oxygen levels, any work plaintiff does involving exercise, contributes to his shortness of breath. He thus has a decreased ability to do any work involving physical exercise of any kind. In addition, after bronchodilators, plaintiff's FEF improved.
17. Even at rest, plaintiff hyperventilates in order to maintain his oxygen level. Normal carbon dioxide levels should be between 35 and 45 at rest. Plaintiff has a carbon dioxide level at rest of 30. With any exercise at all, plaintiff overrides his system. Plaintiff's diffusion capacity is also decreased. Plaintiff had some decrease in his lung volumes; the spirometry test indicated a decrease in flow rate. Plaintiff, in 1995, had a decreased capacity to extract oxygen out of the air. Plaintiff's impairment from tests done, indicated gas exchange impairment.
18. Dr. Samuel R. Rose, a toxicologist, was also of the opinion that plaintiff suffered from dental technician's pneumoconiosis after examination of plaintiff's medical records.
19. Dr. Shanks and Dr. Rose recommended that plaintiff not work in a dental laboratory. Although plaintiff had anticipated working subsequent to his turning 65, he retired from working at defendant-employer's in December 1993, and has not worked since. Defendant-employer did not offer plaintiff another position.
20. After retiring, plaintiff and his wife moved to Summerville, Florida, where the cost of living is lower than in Charlotte, North Carolina. Plaintiff has unsuccessfully sought work in the retail sales industry available near his residence but has not been offered employment.
21. Plaintiff has proven by a preponderance of the competent credible evidence of record that he suffers from dental technician's pneumoconiosis, an occupational disease. While working for Precision Dental Lab, plaintiff was exposed to a wide variety of hazardous chemicals that are known to cause lung disease.
22. The processes in which plaintiff was engaged as a dental technician with defendant-employer, were very dusty and the technicians at defendant-employer's failed to wear masks regularly. The mixing process, sandblasting process, grinding and polishing processes all produced dust. These processes subjected plaintiff to dust from cobalt, chromium, silica, graphite, aluminum oxide, silicone carbide, titanium dioxide, zinc oxide fume, iron oxide fume and other chemicals.
23. The old facilities of Precision Dental Laboratory on Central Avenue, in use since the 1940's, were very dusty and had been largely unimproved. The new facility, although having increased ventilation, was also dusty.
24. As a result of plaintiff's work as a dental laboratory technician, plaintiff had a greater risk of developing dental technician's pneumoconiosis than members of the public generally.
25. Plaintiff's exposure to the hazardous substances at his work, was a significant causal factor in the development of his dental technician's pneumoconiosis. Both Dr. Shanks and Dr. Rose are in agreement on the issue of causation. Dr. Jones does not disagree.
26. The medical literature, such as it exists, underscores the opinions of Dr. Rose and Dr. Shanks and supports the conclusion that exposure to dust in dental laboratories significantly contributes to the cause of pulmonary fibrosis among dental technician laboratories.
27. Importantly, plaintiff was not exposed to any substance outside his employment which could have caused his disease of dental technician's pneumoconiosis.
28. Despite the fact that several of the dental technician's diagnosed with dental technician's pneumoconiosis and written up in the medical literature have the striking feature of the presence of strongly light reflecting particles consisting of chromium, cobalt and molybdenum in their lungs, such particles can only be observed in by virtue of open lung biopsy. Plaintiff did not undergo an open lung biopsy. Similarly, there are several known case studies of dental technician's pneumoconiosis in which fibrosis seems to be confined to the upper lobes. However, the number of persons demonstrating this radiography is extremely low, as is the entire sample of persons diagnosed and discussed in the medical/scientific literature concerning dental technician's pneumoconiosis.
29. Testimony of other employees of defendant-employer to the effect that plaintiff's pulmonary fibrosis could not be caused by his work at Precision Dental Lab due to lack of exposure is not credible or persuasive. Precision Dental Lab did not regularly monitor or test the ambient air in the laboratory and the amount of particles in the air at the laboratory on any given day was unknown. Moreover, employees and safety managers of Precision Dental Laboratory did not know the levels considered safe by the Occupational Safety and Health Administration on the materials safety data sheets.
30. Plaintiff is disabled due to his occupational disease of dental technician's pneumoconiosis and is not able to obtain employment of any kind or near his retirement home in Florida. Moreover, due to plaintiff's age, his lack of education and his physical condition which requires him to be sedentary, further search for employment would in all probability be futile. Plaintiff, as a result of his occupational disease and disability, is incapable of earning wages of any kind.
31. Defendants have produced no evidence from doctors or vocational expert to demonstrate that plaintiff is capable of obtaining employment and earning wages of any kind.
32. Even without proof that plaintiff unsuccessfully sought work, the evidence at the hearing, introduced by plaintiff, establishes with a preponderance of the credible evidence that plaintiff has been unable to find work because his age, physical restrictions and education would make a job search futile. Plaintiff's lack of education and experience in other fields precludes his obtaining anything but low skill jobs which often require the most amount of physical effort.
33. Plaintiff has met his burden of proof of establishing each and every element of an occupational disease claim.
34. Plaintiff will require medical treatment for the rest of his life, including monitoring and medication.
35. The appeal to the Full Commission in this mater was brought by the insurer and through this Opinion and Award the insurer is ordered to make payments of benefits to plaintiff.
****************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff suffers from dental technician's pneumoconiosis which is an occupational disease under the Workers' Compensation Act. G.S. § 97-53 (13). Plaintiff was exposed to chemical dust for over forty years, including a number of years at Precision Dental Laboratory. He did not have such exposure to chemical dust outside of his employment. Moreover, plaintiff did not have evidence of diffuse interstitial pulmonary fibrosis prior to his employment at Precision Dental Laboratory or before 1991.
2. Plaintiff's job as a dental laboratory technician at Precision Dental Laboratory exposed him to a greater risk of contacting dental technician's pneumoconiosis than members of the public in general. G.S. § 97-53 (13); Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
3. Plaintiff's dental technician's pneumoconiosis was caused by his exposure to chemical dust at Precision Dental Laboratory and significantly contributed to the development of his pulmonary fibrosis. Id.
4. As a result of his occupational disease, plaintiff is totally and permanently disabled and unable to earn wages of any kind. As a result of his disability, plaintiff is entitled to compensation at two thirds of his average weekly wage of $610.41 or $406.94 beginning 1 January 1994 for the remainder of plaintiff's life or until defendants obtain permission from the Industrial Commission to cease payment of permanent total disability compensation. G.S. § 97-29. Grantham v. R.G.Berry, Corp., 115 N.C. App. 293, 444 S.E.2d 659 (1994).
5. Even though plaintiff voluntarily retired, such an act does not preclude a finding of disability since plaintiff is unable to earn wages of any amount. Disability benefits may not be denied because a claimant retires when there is evidence of diminished earning capacity caused by an occupational disease. Heffnerv. Cone Mill Corp., 83 N.C. App. 84, 349 S.E.2d 70 (1986). Plaintiff is unable to obtain employment as a dental technician or in any other work due to his limited capacity for physical exertion and the nature of his disease which affects his lung gas exchange mechanism and impairs his thinking mechanism. Plaintiff has actually applied for jobs but has not been offered employment and defendants have produced no evidence from a doctor or vocational expert to demonstrate that plaintiff can obtain employment. G.S. § 97-29. Bridges v. Linn-CorriherCorp., 90 N.C. App. 397, 368 S.E.2d 388, disc. rev.den.; 323 N.C. 171, 373 S.E.2d 104 (1988). Peoples v.Cone Mills, 316 N.C. 426, 342 S.E.2d 798 (1986).
6. Plaintiff is entitled to reasonable and necessary nursing services, medicine, sick travel, medical, hospital and other treatment or care or rehabilitation services during his lifetime which is necessary to treat his occupational disease of dental technician's pneumoconiosis. G.S. § 97-25.
7. The appeal to the Full Commission in this mater was brought by the insurer and through this Opinion and Award the insurer is ordered to make payments of benefits to plaintiff, thereby entitling counsel for plaintiff to a reasonable attorney's fee of $500.00, to be paid as part of the bill of costs. G.S. § 97-88. This fee is in addition to the fee awarded in Award Paragraph (3).
****************
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. Defendants shall pay total and permanent disability compensation at the rate of two thirds of plaintiff's average weekly wage of $610.41 beginning January 1, 1994 up until the present date. This amount has accrued and shall be paid to plaintiff in a lump sum subject to the attorney's fees hereinafter approved. Total and permanent disability compensation shall be paid thereafter at the same rate for the remainder of plaintiff's life or until the Industrial Commission issues an Order to cease payment of compensation.
2. Defendants shall pay all continuing and necessary nursing services, medicine, sick travel, medical, hospital, other treatment or care or other rehabilitative services which result from plaintiff's occupational disease of dental technician's pneumoconiosis when bills for the same have been submitted through defendants and are approved by the Industrial Commission.
3. A reasonable attorney's fee of 25% of the compensation due plaintiff which has accrued in paragraph one (1) above is approved and shall be paid directly to plaintiff's counsel. Thereafter, defendants shall pay plaintiff's counsel every fourth compensation check due plaintiff.
4. Defendants shall pay to counsel for plaintiff an additional attorney's fee of $500.00 as part of the bill of costs and pursuant to the provisions of G.S. § 97-88.
5. Defendants shall pay the costs.
 S/ _____________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _____________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ _____________________ DIANNE C. SELLERS COMMISSIONER